Filed 12/10/24  In re K.R. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K.R. et al., Persons Coming Under the Juvenile Court Law. | B323191 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>B.R. et al.,<br><br>Defendants and Appellants. | Los Angeles County Super. Ct. No. 21CCJP05315 |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore. Conditionally reversed in part and remanded with directions.

Karriem Baker, under appointment by the Court of Appeal, for Defendant and Appellant D.O.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Appellant B.R.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

This appeal arises out of the juvenile dependency proceedings relating to K.R. and H.R., born in June 2010 and September 2017, respectively. B.R. is the mother of both children. Non-party R.J. is H.R.'s father and D.O. (father) is K.R.'s father. Before this case was initiated, the children were in mother's care.

In August 2022, the juvenile court exercised jurisdiction over the children under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b). Unlike H.R., who was placed with her parents, the court removed K.R. from mother, declined to place K.R. with father per his request as a non-offending noncustodial parent under section 361.2, subdivision (a), and placed K.R. with her maternal grandparents.

On appeal, mother contends the jurisdictional findings are unsupported by substantial evidence and, therefore, subject to reversal. For this reason, and because father was non-offending, she argues the dispositional order pertaining to K.R. must also be reversed. Father joins mother's arguments. Alternatively, he asserts the portion of the dispositional order placing K.R. with her maternal grandparents must be reversed, as the record lacks sufficient evidence demonstrating she would suffer detriment if required to live with him. He also contends K.R.'s dispositional order must be conditionally reversed because the Department of

_____

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

Children and Family Services (Department) failed to discharge its duty of initial inquiry under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related California law.

The parties are familiar with the facts and procedural history of the case, so we do not fully restate those details here. Instead, in the Discussion, *post*, we discuss the facts as needed to provide context for and resolve the issues presented on appeal.

With respect to mother's appeal, we first conclude the juvenile court erred by finding K.R. fell within the purview of section 300, subdivision (b) based on mother's emotional abuse. We then conclude, however, it correctly declared both children dependents of the court under section 300, subdivisions (a) and (b), as the record contains sufficient evidence showing they were at substantial risk of serious physical harm due to mother's history of violence with R.J. We therefore need not address mother's challenges to the other jurisdictional findings and reject her assertion that K.R.'s dispositional order must be reversed.

With respect to father's appeal, we reject father's contention that the detriment finding under section 361.2, subdivision (a) must be reversed due to insufficient evidentiary support. However, we agree with father that K.R.'s dispositional order must be conditionally reversed due to the Department's failure to comply with ICWA's inquiry requirements.

## DISCUSSION

### I. Mother's Appeal

#### A. Justiciability

We begin by addressing the Department's assertion that, to the extent she challenges the jurisdictional findings pertaining to H.R., mother's appeal should be dismissed as moot.

"An order terminating juvenile court jurisdiction generally renders an appeal from an earlier order moot." (*In re Rashad D.* (2021) 63 Cal.App.5th 156, 163.) "However, dismissal of a dependency appeal for mootness following termination of jurisdiction 'is not automatic, but "must be decided on a case-by-case basis."'" (*Ibid*.) "A case becomes moot when events '"render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him [or her] any effect[ive] relief."' [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).) Thus, to avoid a finding of mootness, the appealing parent must "demonstrate[ ] a specific legal or practical consequence that would be avoided upon reversal of the [challenged] jurisdictional findings . . . ." (*Id.* at p. 273.)

Mother acknowledges that, while this appeal was pending, the juvenile court terminated jurisdiction over H.R. and awarded her and R.J. joint physical and legal custody. In arguing the court's actions have not rendered the portions of her appeal relating to H.R. moot, however, she "has not demonstrated a specific legal or practical consequence that would be avoided upon reversal of the [challenged] jurisdictional findings." (*D.P.*, *supra*, 14 Cal.5th at p. 273.) We therefore agree with the Department that her challenges to the jurisdictional findings pertaining to H.R. are moot and turn our attention to whether to exercise discretionary review. (See *id.* at pp. 273, 277.)

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P.*, *supra*, 14 Cal.5th at p. 282.) In deciding whether to exercise

4

discretionary review, we consider the following factors: (1) "whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or "'could have other consequences for [the appellant], beyond jurisdiction""'; (2) "whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct"; and (3) "why the appeal became moot." (*Id.* at pp. 285-286.) These "factors . . . are not exhaustive, and no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal." (*Id.* at p. 286.)

Having considered the *D.P.* factors, we conclude discretionary review is appropriate. Specifically, we find the jurisdictional findings against mother may play a role in future dependency and/or family law proceedings, such that "ensuring the validity of [the challenged] findings . . . [is] particularly important." (*D.P.*, *supra*, 15 Cal.4th at p. 285.) In addition, the parties do not dispute that jurisdiction over H.R. was terminated based on mother's prompt compliance with her court-ordered case plan; therefore, "discretionary review [is] especially appropriate" here. (*Id.* at p. 286.) Accordingly, we will not dismiss mother's appeal.

### B.    Jurisdictional Findings

In exercising jurisdiction over the children, the juvenile court found they were at substantial risk of serious physical harm due to mother's history of domestic violence with R.J., mental and emotional problems, and placement of K.R. in a detrimental situation by driving a vehicle, in which K.R. was a passenger, while under the influence of marijuana. It additionally

5

found K.R. fell within the purview of section 300, subdivision (b) because mother emotionally abused her.

With respect to the emotional abuse allegations, the juvenile court acknowledged the petition filed by the Department alleged jurisdiction was necessary under section 300, subdivision (c)(1).[2] Based on the evidence presented, the court found mother's verbal abuse was "definitely hurtful to [K.R.] and plac[ed] her at risk," but did not "rise[ ] to the level of a c-1 count." Thus, it sustained the emotional abuse allegations under subdivision (b) rather than subdivision (c).

Mother disputes the sufficiency of the evidence underlying each jurisdictional finding. We begin by addressing her challenge to the emotional abuse finding. On this point, mother contends jurisdiction was improper under section 300, subdivision (b) because the record lacks evidence showing her verbal abuse placed K.R. at risk of physical – rather than emotional – harm. We agree.

Under section 300, subdivision (b)(1)(A), the juvenile court may exercise jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] (A) The failure or inability of the child's parent . . . to adequately supervise or protect the child . . . ." ""A jurisdictional finding under section 300, subdivision (b) requires: '"(1) neglectful conduct by the

_____

2      Section 300, subdivision (c) permits the juvenile court to exercise jurisdiction when "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian . . . ."

6

parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.] The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future . . . .' [Citation.]"'" (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.) Consequently, jurisdiction may not lie under section 300, subdivision (b) "where . . . one parent has behaved badly, undeniably causing family trauma, but presents no obvious threat to the child['s] physical safety." (*Id.* at p. 112.)

"""In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.'" [Citations.] However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.)

The record demonstrates mother has verbally abused K.R. K.R. told the Department that mother screams and curses at her, calls her names, makes fun of her, shames her, and compares her

7

to others. Consistent with K.R.'s statements, A.R. (maternal grandmother) related K.R. has said mother "'cuss[es]' her out," calls her names while she is crying, and has "threat[en]ed to 'beat the sh[*]t out of her.'" H.R. likewise reported mother gets angry with K.R., has yelled at K.R. "'a lot of times,'" and "'yells bad words' at [K.R.]"

As a result of mother's verbal abuse, K.R. has suffered emotional harm. Specifically, K.R. reported that in September 2021, she had a panic attack after mother teased her and called her names. According to K.R.'s therapist, Dr. Corinne Hickson, mother's actions have caused K.R. to develop feelings of anger, pain, hatred, and abandonment. Dr. Hickson also reported K.R. experiences severe anxiety stemming largely from her high-conflict relationship with mother and mother's emotionally abusive behavior.

Emotional harm, however, does not provide a basis for jurisdiction under section 300, subdivision (b). "As appellate courts have repeatedly stressed, "'[s]ubdivision (b) means what it says. Before courts and agencies can exercise jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness."'" (*In re Jesus M.*, *supra*, 235 Cal.App.4th at p. 111, original italics.) And while the record demonstrates K.R. has sustained *emotional* harm as a result of mother's verbal abuse, we could not locate any evidence showing she has suffered, or was at risk of suffering, *physical* harm. The record, for example, does not reflect K.R. has thought about or engaged in acts of self-harm due to emotional pain mother has inflicted. Nor does it establish K.R.'s anxiety affects her physical health, such as by impairing her daily functioning or driving her to illicit substances to cope.

Attempting nonetheless to draw a connection between mother's emotionally abusive behavior and a risk of physical harm to K.R., the Department asserts: "Mother's treatment of K.R. caused the 11-year-old child to run away because she was scared to be in mother's care, subjecting her to risk of physical harm." This argument fails because it misrepresents the record. Specifically, the record does not demonstrate mother's conduct drove K.R. to flee her home indefinitely without explaining her whereabouts, as the Department suggests. Rather, it shows that in September 2021, K.R. refused to attend a concert with mother in Las Vegas, left the family home, and went to her maternal aunt's home nearby. We did not find any evidence demonstrating K.R. was at substantial risk of serious physical harm while en route to or upon arrival at her aunt's home. Nor could we locate any evidence showing K.R. was likely to take more drastic actions subjecting her to such risk.

Accordingly, on the record before us, we conclude the juvenile court erred by finding K.R. fell within the purview of section 300, subdivision (b) based on mother's emotional abuse. In light of this conclusion, we consider whether the court's other jurisdictional findings rest on adequate evidentiary support.

In addition to exercising jurisdiction over K.R. based on mother's emotional abuse of the child, the juvenile court also declared K.R. and H.R. dependents of the court under section 300, subdivisions (a) and (b), finding they were at risk of harm due to mother's history of violence with R.J.[3] Arguing the court

---

3      Section 300, subdivision (a) permits the juvenile court to exercise jurisdiction over a child if it finds "[t]he child has suffered, or there is a substantial risk that the child will suffer,

erred in so doing, mother acknowledges she and R.J. have engaged in violent altercations, but asserts they will not do so in the future because: (1) the most recent incident "occurred one or two years prior to the jurisdiction hearing" held in August 2022; (2) mother and R.J. ended their romantic relationship; and (3) she "voluntarily and successfully completed her domestic violence services."

Mother correctly observes the record contains evidence supportive of a finding contrary to that of the juvenile court's regarding the risk of harm posed to the children by her history of violence with R.J. The existence of evidence conflicting with a jurisdictional finding does not justify reversal, however. Instead, as noted above, when reviewing jurisdictional findings on appeal, we must view the record in the light most favorable to the finding, draw all reasonable inferences to support it, and uphold the finding so long as it "is supported by substantial evidence even if substantial evidence to the contrary also exists." (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 382.) Applying this standard, we conclude the record contains substantial evidence demonstrating that, at the time of the adjudication hearing, the children remained at risk of harm due to mother's history of violence with R.J.

Mother and R.J. were in an on-and-off relationship for five years, which ended around February 2021. According to maternal

---

serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." "Domestic violence is nonaccidental" and, therefore, dependency cases based on exposure to domestic violence may be filed under section 300, subdivision (a) or subdivision (b). (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599-600.)

grandmother, the relationship was not healthy, and it was not mother's first abusive relationship. Soon after she and R.J. began dating, mother told her sister and maternal grandmother that R.J. had grabbed her roughly. Subsequently, more than once, R.J. and mother engaged in violence in the children's presence. On one occasion, K.R. saw R.J. grab mother by the collar of her shirt and "'put his fist up like he was going to hit her.'" K.R. intervened and "'stopped him.'" Another incident took place in 2020, while H.R. was with her parents in a car parked outside maternal grandmother's home. H.R. witnessed R.J. hit mother's head into the car's steering wheel, causing her lip to bleed. After bringing H.R. into maternal grandmother's home, mother carved the word "liar" into the hood of R.J.'s car and slashed his tires. H.R. was "'screaming bloody murder'" after the incident and talked about it for weeks. Thereafter, mother did not contact law enforcement or seek help per maternal grandmother's suggestion. Instead, mother went to Las Vegas with friends and later reconciled with R.J.

Although no longer involved romantically, mother and R.J. still interact regularly because they are co-parenting H.R.[4] Their relationship continues to be fraught with conflict. R.J. related he and mother get into arguments because she is easily irritated. Before the adjudication hearing, while H.R. was in R.J.'s care, the Department observed the parents "had some difficulty working together for the best interest of [H.R.]" Consequently, the Department had to intervene and mediate the parents' disputes

---

4       For this reason, mother's reliance on *In re Ma.V.* (2021) 64 Cal.App.5th 11 is misplaced. There, in contrast with the present case, the mother not only ended her relationship with her former abuser, but also ceased all further contact with him. (*Id.* at p. 22.)

over coordinating visitation times, exchanges, and other matters. Further, mother openly criticized R.J. and disapproved his parenting style, asserting he was incapable of caring for H.R.

We acknowledge that mother completed a domestic violence program for victims before the adjudication hearing took place. While she has expressed concern about H.R.'s safety in R.J.'s care, fearing R.J. may become violent in his current relationship, mother has not exhibited any insight or awareness into how her own aggressive behaviors toward R.J. endangered her children. Nor has mother acknowledged how her tendency to instigate and escalate conflicts may have contributed to violence between her and R.J. Instead, mother has continuously blamed others for the Department's involvement with the family.

In sum, the record reflects mother and R.J. have a history of violence and that, at the time of the adjudication hearing, they remained in a tense co-parenting relationship in which they continued to have disagreements requiring Department intervention. Based on this evidence, as well as mother's failure to take responsibility for her role in her altercations with R.J., the juvenile court could reasonably find the children were at substantial risk of serious physical harm due to the probability of violence recurring between mother and R.J.

Having concluded the juvenile court correctly exercised jurisdiction over the children pursuant to section 300, subdivisions (a) and (b) based on the petition's domestic violence allegations, we need not address whether the other jurisdictional findings are supported by substantial evidence. It is well-settled that "'[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's

finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

### C. Dispositional Order Regarding K.R.

Mother asserts the dispositional order relating to K.R. must be reversed because the juvenile court erred by exercising jurisdiction over her. As discussed above, however, the court properly found K.R. fell within the purview of section 300, subdivisions (a) and (b). We therefore reject mother's contention that K.R.'s dispositional order must be reversed based on the court's improper exercise of jurisdiction.

## II. Father's Appeal

### A. Justiciability

Turning our attention to father's appeal, we begin by addressing the Department's assertion that his challenge to the detriment finding rendered under section 361.2, subdivision (a) is moot. On this point, the Department argues: "[E]ven if father prevails on [his challenge], this [c]ourt cannot grant effective relief because unchallenged, superseding orders demand [K.R.] remain with her grandparents." Specifically, it observes that, while this appeal was pending: (1) at review hearings held in February and May 2023, the juvenile court ordered K.R. to remain in out-of-home care, finding she would suffer detriment if returned to the custody of either parent; and (2) at the section 366.26 hearing held in November 2023, the court granted K.R.'s

13

maternal grandparents legal guardianship of the child. Father, however, did not appeal any of these orders.

Father does not address or otherwise dispute whether his challenge to the detriment finding is moot. Assuming, *arguendo*, that this is the case, we have considered the *D.P.* factors and again conclude discretionary review is proper. Mother and father have a history of involvement in hostile and contentious family law proceedings relating to custody of and visitation with K.R. The juvenile court's detriment finding under section 361.2, subdivision (a) may play a role in future proceedings of this nature. Therefore, "ensuring [the finding's] validity . . . [is] particularly important." (*D.P.*, *supra*, 15 Cal.4th at p. 285.)

### B.    Dispositional Order – K.R.'s Placement

"When a juvenile court orders removal of a child from the custodial parent, it must determine whether there is a noncustodial parent who wants to assume custody. If so, the court must 'place the child with the [noncustodial] parent unless it finds that [such] placement . . . would be detrimental to the safety, protection, or physical or emotional well-being of the child.' (§ 361.2, subd. (a).)" (*In re Solomon B.* (2021) 71 Cal.App.5th 69, 74-75.) "A finding of detriment must be made by clear and convincing evidence." (*Id.* at p. 75.)

In determining whether placement with a noncustodial parent would be detrimental to the child, the juvenile court must "weigh all relevant factors to determine if the child will suffer net harm." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425.) Relevant factors may vary with each case but generally include the child's relationship or lack thereof with the noncustodial parent, the child's wishes, the child's need for services, and the existence and quality of the child's bond with other family

14

members. (See *ibid.* [sibling relationships]; *In re A.C.* (2020) 54 Cal.App.5th 38, 43 [absence of relationship between parent and child, child's wishes]; *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262-1264 [need for continued therapeutic services].) No one factor is dispositive, including the child's preferences. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1402 (*C.M.*).)

"We review the juvenile court's finding of detriment for substantial evidence, 'bearing in mind the heightened burden of proof' in the trial court." (*In re Solomon B.*, *supra*, 71 Cal.App.5th at p. 75.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012 (*O.B.*).)

Father contends the detriment finding must be reversed because it lacks sufficient evidentiary support. In support of his position, father emphasizes: (1) he would pose no danger to K.R.'s physical safety, as he has no history of abuse or criminal activity; (2) he did not abandon K.R.; (3) mother and maternal grandmother sabotaged his relationship with K.R.; and (4) K.R.'s reports of anxiety around the idea of her residing with father were exaggerated and not credible. For the reasons discussed below, we are not persuaded by his contentions.

First, father's argument misses the mark by fixating on how K.R.'s negative feelings toward him were largely the product of mother and maternal grandmother's influence, rather than any wrongdoing on his part. This is because, for purposes of section 361.2, subdivision (a), a detriment finding need not be related to misconduct by the noncustodial parent. (See *In re Luke M.*, *supra*, 107 Cal.App.4th at p. 1425.) Rather, as noted above, the juvenile court must "weigh all relevant factors to determine if the child will suffer net harm." (*Ibid.*)

Second, father's argument fails because it essentially asks us to disregard the applicable standard of review. In discussing the record, father focuses on the evidence supportive of his position while ignoring or downplaying the evidence against him. As discussed above, however, we cannot examine the record through his proffered lens. Instead, we "view the record in the light most favorable to the" challenged finding, "indulge reasonable inferences that the trier of fact might have drawn from the evidence," "accept the fact finder's resolution of conflicting evidence," and defer to the juvenile court's credibility determinations. (*O.B.*, *supra*, 9 Cal.5th at p. 1008.) Applying these principles, we conclude the detriment finding must be upheld.

Father was not involved in K.R.'s life until she was two years old, when a paternity test confirmed she was his child. At that point, he sought visitation with and custody of K.R. The family court ultimately granted mother primary physical custody of K.R. and awarded father overnight visits every other weekend, as well as three-hour visits every other Wednesday and alternating holidays. The parents later agreed to drop father's Wednesday visits due to his work schedule.

Until K.R. was four years old, father's visits were monitored and went well. Upon becoming unmonitored, however, K.R. started having meltdowns, throwing fits, and expressing she did not want to visit father. K.R.'s negative shift in her view of father was the result of mother's manipulation and influence, which began when K.R. was two years old. In any event, K.R. visited until she was 11 years old, when father moved to Nebraska. Maternal grandmother reported K.R. seemed to enjoy the visits at one point in time. K.R., however, related that she never liked visiting father, and that he forced her to go with him.

After father moved to Nebraska in January 2021, his relationship with K.R. worsened. According to K.R., father left without saying goodbye to her, causing her to feel angry and as though he had abandoned her. At the time of the adjudication hearing, K.R. had not visited father for over a year and a half. He also did not maintain regular phone contact with K.R. Nor did he ask the family court to modify its visitation order after realizing his weekend visits with K.R. were no longer feasible, and mother refused to allow K.R. to stay with him for part of the summer. Moreover, when father visited California with his family in the summer of 2021, he did not make any efforts to see K.R. during the trip. Consequently, K.R. adamantly told the Department that she wants nothing to do with father, does not want a relationship with him, and does not want to visit or live with him. In February 2022, she declined to have a conversation with him facilitated by the Department. K.R. believed father was not a good person; instead, she viewed him as "the 'bad guy'" who did not want her and was "'not [her] real family.'"

Dr. Hickson, K.R.'s therapist, confirmed the negative nature of K.R.'s relationship with father. According to Dr.

Hickson, K.R. feels abandoned by both of her parents and was experiencing a great deal of emotional pain. Dr. Hickson further related K.R. has experienced anxiety when thinking about visiting or living with father. Dr. Hickson also opined K.R. was in desperate need of stability, but "father has not offered much in the way of stability in that he has not been consistently involved with [K.R.] for over a year."

In sum, the record reflects father was not a part of K.R.'s life until she was two years old. While she visited him on weekends for several years, their relationship became rocky as mother instilled in K.R. negative beliefs about his character. The relationship then deteriorated after father moved to Nebraska in January 2021 and largely ceased efforts to maintain contact with K.R. Ultimately, due to multiple factors – including father's inaction following his relocation and mother's influence on K.R.'s view of him – K.R. harbored many negative feelings toward father, did not view him as a part of her family, refused to live with or visit him, and became anxious when presented with the idea of doing so.[5] And while K.R. was growing more receptive to having a relationship with father as the adjudication hearing

5        In support of his position, father analogizes this case to *C.M.*, *supra*, 232 Cal.App.4th 1394 and asserts K.R.'s "wish to remain with [her] maternal grandparents" and "lack of an established relationship with father" are insufficient to support a detriment finding under section 361.2, subdivision (a). Unlike *C.M.*, however, the evidence in this case shows that, besides wanting to live with her grandparents, K.R. has a complicated relationship with father marred by strong feelings of anger, hostility, abandonment, and distrust. Therefore, *C.M.* is distinguishable and does not apply.

approached, he was not in a position to provide K.R. with the stability that her therapist opined she needed and desired.

Thus, based on the evidence discussed above, we conclude "the record as a whole contains substantial evidence from which [the juvenile court] could have found it highly probable that" K.R.'s "placement with [father] would be detrimental to . . . [her] emotional well-being." (*O.B.*, *supra*, 9 Cal.5th at p. 1011; § 361.2, subd. (a).) The court therefore did not err by denying father's request for placement under section 361.2, subdivision (a).

### C.    ICWA

Finally, father contends K.R.'s dispositional order must be reversed, as the Department failed to discharge its duty of initial inquiry under ICWA and related California law. Specifically, he argues that although the Department was in contact with several of K.R.'s relatives while her dependency case was open, it failed to ask any of them about whether she had any Indian ancestry as required under section 224.2. In response, the Department concedes it did not discharge its duty of inquiry, but maintains reversal is not required because any ICWA error was harmless.

While this appeal was pending, our Supreme Court published its opinion in *In re Dezi C.* (2024) 16 Cal.5th 1112, which resolved a split in authority regarding "whether a child welfare agency's failure to make the statutorily required initial inquiry under California's heightened ICWA requirements constitutes reversible error." (*Id.* at p. 1125.) In so doing, it held that "error resulting in an inadequate initial Cal-ICWA inquiry requires conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with [California Rules of Court] rule 5.481(a)(5), and when necessary, comply with the

notice provisions of section 224.3." (*Id.* at p. 1136). Accordingly, because we agree with the parties that the Department's ICWA inquiry was insufficient, we must conditionally reverse the dispositional order pertaining to K.R. (*Ibid.*)

## DISPOSITION

The jurisdictional finding based on mother's emotional abuse is reversed. In all other respects, the jurisdictional order is affirmed. The dispositional order relating to K.R. is conditionally reversed. The matter is remanded to the juvenile court with instructions to the court and the Department to comply with the inquiry, notice, and documentation requirements of ICWA. If the juvenile court subsequently determines that ICWA does not apply, then it shall reinstate the dispositional order. If the court determines that ICWA applies, then it shall proceed in conformity with ICWA and related California law.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, P. J.

We concur:

MORI, J.

ZUKIN, J.

20